UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CITY OF NEW YORK AND THE
PEOPLE OF THE STATE OF NEW YORK,
                                Plaintiffs,

                -against-

FEDEX GROUND PACKAGE SYSTEM,
INC.,
                                Defendant.

**OPINION AND ORDER**

13 Civ. 9173 (ER)

Ramos, D.J.:

        This action brought by the City of New York and the State of New York involves the

alleged shipping of untaxed cigarettes by FedEx in violation of federal and state law.[1]  FedEx is

alleged to have knowingly shipped untaxed cigarettes on behalf of seven shippers:  Shinnecock

Smoke Shop, Native Made Tobacco ("Native Made"), FOW Enterprises ("FOW"), Cigarettes

Direct To You ("CD2U"), Shinnecock Indian Outpost, Your Kentucky Tobacco Resource Center

LLC ("YKTR"), and Two Pine Enterprises ("Two Pine").  Plaintiffs seek the following relief:

(1) damages, penalties, injunctive relief, and appointment of a Special Master under the

Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341–46; (2) injunctive relief

under N.Y. Exec. L. § 63(12); (3) injunctive relief under N.Y. P.H.L. § 1399-ll; (4) appointment

of a Special Master as an independent monitor to oversee FedEx's compliance with any

injunctive relief awarded; (5) stipulated penalties of $1,000 for each of FedEx's deliveries of

cigarettes made in violation of N.Y. P.H.L. § 1399-ll; and (6) penalties of $5,000 for each of

FedEx's deliveries of cigarettes made in New York State in violation of § 1399-ll under N.Y.

---

[1] The factual and procedural background of the case is extensively set forth in the Court's opinion on the parties'
cross-motions for summary judgment, familiarity with which is presumed; this opinion will instead focus on the
testimony of the proffered experts at issue.

Exec. L. § 63(12).[2] *See* Joint Pretrial Statement at 18–19. Trial for this action is set to begin on October 16, 2018.

The parties filed motions in limine to exclude the testimony and reports of six proffered expert witnesses. Plaintiffs proffer as expert witnesses Laura Stamm, Dr. Sonia Angell, and Dr. Rebecca Williams. Doc. 480. FedEx proffers as expert witnesses Dr. Michael J. Moore, Scott Drenkard, and Patrick Fleenor. Docs. 472, 477. The parties filed their respective motions in limine on May 24, 2018; Docs. 472, 477, 480; their opposition briefing on June 27, 2018; Docs. 498, 504; and their replies on July 18, 2018; Docs. 517; 520.

## I.     LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

"As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 589). In interpreting Rule 702, district courts, under *Daubert*, may consider,

---

[2] The State seeks (5) and (6) separately from the City of New York.

Plaintiffs initially had more claims to relief; claims that have been withdrawn by Plaintiffs or dismissed by this Court in the course of this litigation are excluded here.

depending on the case, the following non-exhaustive list of factors to determine whether evidence is sufficiently reliable: (1) whether a theory or technique had been and could be tested, (2) whether it had been subjected to peer review, (3) what its error rate was, and (4) whether scientific standards existed to govern the theory or technique's application or operation. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "the Supreme Court held that the trial judge's gatekeeping obligation applies not only to testimony based on 'scientific' knowledge, as in *Daubert*, but also to testimony based on 'technical' or 'other specialized' knowledge." *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004).

Additionally, a proposed expert witness must be, in fact, an expert in the area about which he or she intends to testify. *Nimely*, 414 F.3d at 396 n.11. The Second Circuit has explained that the question of whether the expert is indeed qualified is important because under the Federal Rules of Evidence, an expert witness has "substantially more leeway than 'lay' witnesses" in testifying as to opinions that are not based on his or her perception. *Id.* As Rule 702 states, an expert may be qualified by virtue of his or her "knowledge, skill, experience, training, or education[.]" The "the totality of a witness's background" matters. *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (citing 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (2008)). The witness's background only qualifies him or her to testify about the "issues or subject matter[s] within his or her area of expertise." *Haimdas v. Haimdas*, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)). The district judge thus must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). After

all, "an expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 2008 WL 1971538, at *6 n.48 (S.D.N.Y. May 7, 2008).

## II.    DISCUSSION

### A.    *Plaintiffs' Experts*

#### 1.    Laura Stamm

Laura Stamm is an Affiliate of Analysis Group, Inc., a provider of economic, financial and business strategy consulting services that specializes in the interpretation of economic and financial data.  Stamm Rep. ¶ 2.  Analysis Group is headquartered in Boston, MA, and employs about 800 professionals.  Stamm Rep. ¶ 2.  Stamm received a B.A. degree from Williams College in 1984 and a Master's of Science in Management from the Sloan School of Management at M.I.T. in 1989.  Stamm Rep. ¶ 4.  She is also a certified public accountant. Stamm Rep. ¶ 4.  Stamm's resume shows experience with estimating damages, especially in intellectual property and commercial litigation.  *See* Stamm Rep. App'x A at 2–11.

Stamm submitted both an initial report and a rebuttal report to Dr. Michael J. Moore.[3]  In her initial report, Stamm offers "analyses relevant to the determination of damages . . . arising from the residential delivery by FedEx to consumers in New York City and State of cigarettes for which the applicable state and city excise taxes have not been collected."  Stamm Rep. ¶ 1.  To arrive at her opinion as to the proper damages calculation, Stamm assumed that the damages owed to the City would be calculated as the cost of a New York City tax stamp multiplied by the number of cigarette packs FedEx shipped in or into New York City, and that the damages owed

---

[3] FedEx's expert Dr. Moore submitted his initial expert report on December 22, 2017, after the deadline for submission of all initial reports.  Doc. 503 at 7.  The parties agreed that Stamm would file a rebuttal report in lieu of Plaintiffs filing a timeliness objection to Moore's report.  Doc. 503 at 7–8.

to the State would be calculated as the cost of a New York State tax stamp multiplied by the number of packs shipped in or into the state. Stamm Rep. ¶ 10.

Data is available from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on the number of cigarette cartons shipped by FedEx on behalf of YKTR. Stamm Rep. ¶ 29. No documentation exists confirming the amount of cigarette packs shipped in or into New York by FedEx on behalf of the other six shippers involved in this case. Stamm Rep. ¶ 29. To arrive at the number of cigarette cartons shipped in or into New York City and New York State for those six shippers, Stamm had to estimate the number of shipments containing cigarettes and the number of cigarette cartons in each shipment. Stamm Rep. ¶ 29. Stamm made these estimations for shipments that occurred between February 2006 and February 2015. Stamm Rep. ¶ 31.

To estimate the number of cigarette-containing shipments by each shipper, Stamm relied upon the shippers' websites, Stamm Rep. ¶ 47, deposition testimony by FedEx employees and shippers, sales invoices, Improper Shipping Forms (ISF), and claims forms, Stamm Rep. ¶ 48. Stamm then excluded some shipments from the dataset based on reasonableness checks she conducted.[4] Stamm Rep. ¶¶ 40–46.

To estimate the number of cigarette cartons a particular package contained, Stamm relied upon FedEx data on the weights and dimensions of the shipments and compared them to the ATF data on YKTR's shipments. Stamm Rep. ¶ 36. Stamm first identified every unique combination of package weight (rounded to the nearest single decimal) and quantity of cigarette cartons available in the YKTR dataset. Stamm Rep. ¶ 37. Stamm then combined the data into weight

---

[4] A reasonableness check is a test to ensure that the data produced from some type of analysis conforms to the expected ranges. One of the reasonableness checks Stamm conducted, for example, was to exclude from her estimation of the number of cigarette-containing packages shipped any package that had dimensions smaller than 11.1 x 3.3 x 1.9 inches, the dimensions of a small carton of cigarettes. Stamm Rep. ¶ 42.

categories in increments of 0.5 pounds, such that, for example, all weights from 3.5 to 3.9 pounds belonged to one category and all weights 4.0 to 4.4 pounds belonged to another. Stamm Rep. ¶ 37. For each weight category, Stamm identified the modal, or most often observed, quantity of cartons. Stamm Rep. ¶ 37. For example, since her dataset revealed that 74.4% of packages weighing between 4.0 and 4.4 pounds contained six cartons of cigarettes, six cartons was the modal quantity for the 4.0 to 4.4 category. Stamm Rep. ¶ 37. Stamm then created a lookup table that matched each weight category to its corresponding modal quantity. Stamm Rep. ¶ 37. Weight categories ranged from 1.0-1.5 to 54.0-54.5. Stamm Rep. App'x F. For each shipment that her methodology suggested contained cigarettes, Stamm would take the actual weight of the package and use the lookup table to match the package to the modal quantity of cartons for its weight category. Stamm Rep. ¶ 38. Thus, a package weighing 3.7 pounds according to FedEx's records would be considered to contain five cartons, as packages weighing 3.5 to 3.9 most often contained five cartons. Stamm Rep. ¶ 38.

Combining her estimates of how many packages shipped contained cigarettes and how many cartons each package contained, Stamm arrived at an estimate for how many cigarette cartons were shipped by FedEx on behalf of each of the shippers since February 2006. *See* Stamm Rep. at 29. By multiplying the quantity of cartons shipped by the applicable state tax rate on each, Stamm also arrived at a damages estimate. Stamm Rep. at 29.

On February 8, 2018, Stamm also issued a report purporting to rebut Dr. Moore's expert report. Stamm concludes in her rebuttal report that nothing about Dr. Moore's report caused her to change the findings and opinions announced in her initial report, largely because Dr. Moore's report depended on a different legal assumption about the proper measure of damages. Stamm Reb. Rep. at 3. Even if Dr. Moore's legal assumption was correct, Stamm argues, the findings

and opinions in his report are deficient because they are based on unreliable methodologies. Stamm Reb. Rep. at 4.

FedEx argues that Stamm's opinions ought to be excluded under *Daubert* because they are based on unreliable methods and because they invade the province of the jury. The Court agrees in part with FedEx: Stamm may testify regarding her opinion on how many cartons are in a particular package, but she may not testify regarding her opinion on how many packages FedEx shipped contained cigarettes or her opinion on the proper amount of damages in this case.

Stamm may testify as to how many cartons are in a particular package, assuming that package contains cartons. Stamm's method of estimating how many cartons a particular package contained required her to analyze a large amount of raw data. From that data, she noticed a predictive relationship between a package's weight and the number of cartons contained within it. *See generally* Stamm Rep. App'x F. A factfinder would be able to use her findings to make an informed prediction of how many cartons a package contained—an unknown datapoint— based on that package's weight—a known datapoint. The jury would clearly find this information to be valuable. The central factual dispute of the damages issue in this case is how many cigarettes FedEx shipped. And while there are well-kept records of how many packages FedEx shipped for each shipper, there is hardly any evidence of how many cartons were in the packages.

FedEx argues that Stamm's opinions on this matter should be excluded because no other sources support her methodology. FedEx notes that Stamm admitted no "textbook, treatise, or other authoritative document" could "verify the validity of [her] methodology," *see* Doc. 481 at 7 (quoting Konopka Decl., Stamm Tr. at 63:13–22), and that she could not "imagine anyone has written a textbook on estimating cartons of cigarettes in Fed Ex [*sic*] packages," *see* Doc. 481 at

7 (quoting Konopka Decl., Stamm Tr. at 63:20–22). But of course Stamm could not cite any sources that would support her methodology when FedEx frames it as a matter of "estimat[ing] what was inside of packages." That is far too narrow an inquiry. Stamm's goal is to estimate the quantity of cartons in packages; her methodology is to find and use a strong correlation to make informed predictions. It is easily understood and the basis of most data analysis. Her opinions on this issue are admissible under Rule 702.

Stamm may not, however, testify about how many packages shipped by FedEx contained cigarettes. Expert testimony must be circumscribed to ensure that "the expert does not usurp . . . the role of the jury" to make key factual determinations. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Most experts are not percipient witnesses; they are instead helpful to the jury because their specialized expertise enables them to provide opinions based on information "beyond the ken of the layperson." *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018). Where an expert's testimony "does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994), the testimony must be excluded under Federal Rule of Evidence 702. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

In coming up with her opinion on how many packages shipped by FedEx contained cigarettes, Stamm impermissibly "usurped" the role of the jury. Stamm relied on the same types of evidence that a jury traditionally relies upon to answer the sort of question that a jury traditionally answers. As she describes it, she examined the shippers' websites, deposition testimony by FedEx employees and shippers, sales invoices, Improper Shipping Forms (ISF), and claims forms to arrive at estimates of what percentage of the packages shipped by each

shipper contained cigarettes. Stamm Rep. ¶¶ 47–48. For example, Stamm inferred from the frequency of orders to a single address that shipments headed to that address contained cigarettes since customers are more likely to reorder cigarettes than "toys, puzzles, moccasins." Stamm Rep. ¶ 59. In another example, Stamm relied on the deposition testimony of a FOW employee that 60% of its packages contained cigarettes to estimate that, indeed, 60% of its packages contained cigarettes. Stamm Rep. ¶ 56. In doing so, Stamm disregarded the testimony of FOW co-owner Kevin Fow that "probably 80%" of its products sold were cigarettes in order to "be conservative," Stamm Rep. ¶¶ 55, 56, and disregarded a written statement by FOW co-owner Danny Fow that 25% of its UPS and FedEx shipments contained cigarettes because it "look[ed] like a lawyer wrote [it]," *see* Konopka Decl., Stamm Tr. at 96:10–97:12, 99:15–16.

As these examples show, Stamm did not employ any specialized knowledge to arrive at her estimates of how many packages contained cigarettes. The only part of her analysis for which she describes using anything approaching advanced mathematical skills is her reasonableness tests. But reasonableness tests, by definition, only test the validity of conclusions that have already been reached through other means. Stamm reached the conclusions themselves by looking at the evidence, making credibility determinations, and using her common sense— which cogently describes what it is a jury does. Stamm's testimony acts as a substitute for the jury's judgment. It thus must be excluded.

Stamm also may not offer her opinion on the correct amount of damages in this case. Stamm arrived at her calculation of damages by multiplying the applicable tax rate with the number of cigarette cartons shipped, Stamm Rep. ¶ 10, in accordance with the damages formula for which this Court granted summary judgment on September 26, 2018, *see* Doc. 594. To reach an estimate of the number of cigarette cartons shipped, Stamm had to rely on her estimates of

how many packages shipped contained cigarette cartons. That opinion, as explained above, must be excluded for it invades the province of the jury. Consequently, Stamm's opinion on damages must also be excluded.

Because the report and testimony of Dr. Moore is excluded for the reasons explained below, Stamm's rebuttal report to Dr. Moore and her testimony regarding its contents is excluded for lack of relevance.

    2.    Dr. Sonia Angell

Dr. Sonia Angell is the Deputy Commissioner of the Division of Prevention and Primary Care for the New York City Department of Health and Mental Hygiene. Angell Rep. at 1. As part of her job, she oversees the Bureau of Chronic Disease Prevention and Tobacco Control. Angell Rep. at 1. Since Dr. Angell is employed by the City of New York, she is not being compensated for providing her opinion. Angell Rep. at 2. Angell has an M.D. from the University of California San Francisco and a Master of Public Health from University of Michigan, Ann Arbor. Angell Rep. at 1.

Plaintiffs seek to elicit Dr. Angell's opinions on the public health effect of the transport of lower-priced cigarettes into New York State and the City of New York. Angell Rep. at 1–2. Dr. Angell believes that the transport of lower-priced cigarettes "directly injures the public health" by "undermining the taxation measures" put in place by the State and the City to deter smoking. Angell Rep. at 2. To support her opinions, Dr. Angell's report includes statistics from various studies on how many people die from tobacco use and how much tobacco-related health issues cost the City of New York. Angell Rep. at 2–3. Dr. Angell's report also explains how the City passed policies, including cigarette taxes, to deter smoking and thereby prevent its bad public health effects. Angell Rep. at 4–5. She describes evidence showing that increased

tobacco prices deter tobacco consumption, especially for youth, and that the availability of untaxed or low-tax cigarettes in high-tax areas thwarts the regulatory scheme to reduce tobacco consumption. Angell Rep. at 6–11.

The only part of Dr. Angell's report that contains original analysis is her analysis and estimate of how many smokers failed to quit smoking and died by virtue of the cigarettes FedEx's shipped into New York. *See* Angell Rep. at 11–12. To conduct her analysis, Dr. Angell first looked to annual surveys conducted by Plaintiffs from 2006 to 2015 for self-reported data on the quantity and average price paid per pack by smokers. Angell Rep. at 11. From that information she calculated the average quantity of cigarettes and pack price amongst respondents. Angell Rep. at 11. She then assumed the price of an untaxed pack shipped by FedEx to be the median price paid per pack according to survey data—$6.49 in 2006 and $10.80 in 2015—minus the applicable State and City taxes. Angell Rep. at 11. Plaintiffs' counsel directed Dr. Angell to assume that FedEx shipped 667,000 cartons of cigarettes into New York State between 2006 and 2015. Angell Rep. at 11. Under that assumption, Dr. Angell concluded that about 5,000 people would have quit smoking and 1,700 people would have avoided death had the smokers of FedEx-shipped cigarettes instead paid the median price for cigarettes in their area. Angell Rep. at 11–12.

FedEx argues that the Court should exclude Dr. Angell from testifying that without FedEx's shipments, 5,000 people in New York would have quit smoking and 1,700 would have not died. FedEx presents three bases for excluding the testimony: first, Dr. Angell's opinion would not help the jury determine any relevant issue of fact in the case; second, Dr. Angell's opinion is based on an unreliable methodology; third, Dr. Angell is not qualified to testify about

her findings. The Court does not address the latter two bases because it finds that the first basis is sufficient to exclude Dr. Angell from testifying.

As an initial matter, the Court clarifies Dr. Angell's findings, as Dr. Angell did not quite make statements like the ones FedEx attributes to her, *see* Doc. 481 at 23 (claiming that Dr. Angell "alleges that FedEx Ground is responsible for the 'future' deaths of 1,700 New Yorkers and of standing in the way of 5,000 additional smokers who otherwise would have quit"). Dr. Angell found that, assuming about 36,000 people in New York State bought and smoked cigarettes shipped by FedEx from 2006 through 2015, about 5,000 of them would have quit smoking and 1,700 of them would have avoided death if those people had instead paid the median price of cigarette packs in their area. Angell Rep. at 11. Dr. Angell's report is clear that her numbers are entirely dependent on the relevant time frame being 2006 to 2015, and that 133 million untaxed cigarettes were shipped by FedEx during this time. *See* Angell Rep. Ex. 2.

Nonetheless, Dr. Angell's findings must be excluded because they are irrelevant to the issues in this case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (quoting 3 Weinstein & Berger ¶ 702(2)). Such expert testimony thus fails to meet the "fit" requirement of *Daubert* and must be excluded under Rule 702. The factual issues in this case are complex, but few. They are whether FedEx knowingly shipped cigarettes in violation of federal and state law, and to what extent. The precise public health effect of FedEx's conduct, important as it may be, does not help answer the factual issues of this case. Dr. Angell's testimony thus must be excluded.

Plaintiffs argue that Dr. Angell's opinions would help the jury understand the public health purposes behind the laws at issue. Certainly, courts can admit testimony that explains to

the jury the background and purpose behind the legal framework the jury is enforcing. *See, e.g.*, *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) (admitting expert testimony explaining key business concepts for background information). But Dr. Angell's estimates do not furnish any background information about the regulatory scheme; the other parts of her report do that. For example, Dr. Angell cites evidence showing that cigarette taxation decreases consumer demand for cigarettes. Angell Rep. at 6–7. Dr. Angell is free to testify on those matters as FedEx does not move to exclude her from testifying with regard to them.

Plaintiffs also argue that Dr. Angell's findings are relevant to the Court's assessment of civil penalties against FedEx under the CCTA. The CCTA authorizes states and municipalities bringing a civil action under its chapters to seek relief in the form of "civil penalties." 18 U.S.C. § 2346(b)(2). Unlike many other statutes, *see, e.g.*, 18 U.S.C. § 216 (providing for a civil penalty of no more than $50,000 or the amount received or offered by the defendant in criminal cases involving the bribery of a public official), the CCTA does not specify a penalty amount. In *City of New York v. Milhelm Attea & Bros.*, 2012 WL 3579568 (E.D.N.Y. Aug. 17, 2012), the court held that the district judge must consult "existing judicial doctrines and comparable cases and statutes" in determining what size civil penalty to impose, *id.* at *30 (citing *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006); *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 169 (2004); *Morissette v. United States*, 342 U.S. 246, 263 (1952)). Second Circuit case law directs district courts to consider many factors, including "the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399 (2d Cir. 2004).

Dr. Angell's findings are probative of what "injury to the public" FedEx's conduct caused, and thus what size civil penalty FedEx should face. But the Court determines the size of any civil penalty, not the jury. *See, e.g.*, *City of New York v. Golden Feather Smoke Shop, Inc.*, 2013 WL 5502954, at *2 (E.D.N.Y. Oct. 1, 2013). There is thus no need for Dr. Angell to testify as to what injury FedEx's conduct caused, including what public health effects it had. The Court will determine whether civil penalties ought to be imposed and if so in what amount outside of the jury trial.

Thus, Dr. Angell is excluded from testifying on her findings concerning the effects of FedEx's cigarette shipments under Rule 702.

### 3. Dr. Rebecca Williams

Dr. Rebecca S. Williams is the Director of the Internet Tobacco Vendors Study at the Lineberger Comprehensive Cancer Center of the University of North Carolina at Chapel Hill. Williams Rep. at 1. She is also the Co-Investigator and Chief Technology Officer of the Cancer Prevention and Control Research Network's National Coordinating Center and the University of North Carolina's Principal Investigator for the National Cancer Institute-funded Smoke-Free Homes Project. Williams Rep. at 1. Dr. Williams received her B.A. in psychology from the University of Rochester, her Masters of Health Science in Population Dynamics from Johns Hopkins University School of Public Health, and her Doctorate in Health Behavior and Health Education from the University of North Carolina at Chapel Hill School of Public Health. Williams Rep. at 1.

Plaintiffs retained Dr. Williams to provide her expert opinions on the practices of internet cigarette vendors and the shipping services they have used, including FedEx. Williams Rep. at 2. Specifically, Plaintiffs seek to elicit testimony from Dr. Williams concerning the effects of

internet cigarette sales on tax revenue, purchasing habits, smoking practices, and public health, especially as they relate to minors. Williams Rep. at 2. In her report, Dr. Williams cites peer-reviewed, published studies showing that internet cigarette vendors often do not attempt to verify buyers' ages and identities, enabling minors to buy cigarettes from them online. Williams Rep. at 5. Dr. Williams also explains a study she conducted that was eventually published showing that delivery services, including FedEx, often did not verify the ages of customers of online alcohol vendors. Williams Rep. at 10. The study showed that of 100 online alcohol purchase attempts made by underage buyers in the study, 45 were successful. Williams Rep. at 10.

FedEx argues that the Court should exclude Dr. Williams from testifying about youth smoking and age-verification procedures because those topics are outside the scope of the case. The Court agrees. As with Dr. Angell, Dr. Williams's opinions on these matters are far removed from the issues in this case.

Plaintiffs argue that Dr. Williams's testimony on youth smoking and age verification procedures should nonetheless be admissible because they "help explain the purpose and impetus behind the laws at issue." Doc. 504 at 29. Surely that principle of evidence has a limit. A piece of legislation can have many purposes, and vast amounts of ink can be spilt on each. Not all of it can be admitted. Here, Plaintiffs are seeking to admit evidence that implicates FedEx in selling cigarettes to minors in order to help the jury appreciate not what FedEx has done, according to Plaintiffs, but what the purpose of the laws are. The Court agrees with FedEx that such "background" information is more inflammatory than informative. Dr. Williams's testimony

regarding youth smoking and age-verification procedures, by vendors and delivery services, will not be admitted.[5]

B.    *FedEx's Experts*

    1.    <u>Dr. Michael Moore</u>

Dr. Michael Moore is a Principal at Charlottesville Partners LLC.  Moore Rep. ¶ 1.  He received his Ph.D. in economics in 1984 from the University of Michigan.  Moore Rep. ¶ 2.  Dr. Moore has researched, taught, and consulted on microeconomics, including applied price theory, industrial organization, and econometrics throughout his professional career.  Moore Rep. ¶¶ 2–3.  He has been published multiple times and won multiple awards for his research.  Moore Rep. ¶ 4.  He has had academic appointments at multiple universities and was a research associate at the National Bureau of Economic Research from 1996 to 2008.  Moore Rep. ¶ 5.

FedEx retained Dr. Moore to respond to the opinions of Stamm, Dr. Angell, and Dr. Williams.  Moore Rep. ¶¶ 8, 9.  Specifically, in his report, Dr. Moore responds to the methods used by Stamm to calculate damages and the methods used by Dr. Angell and Dr. Williams to evaluate the public health effects of FedEx's conduct.  Moore Rep. ¶¶ 8, 9.

The crux of Dr. Moore's challenge of Stamm's report is that Stamm fails to consider the economic certainty that consumers of FedEx's untaxed cigarettes would have substituted away from the FedEx cigarettes to options other than fully taxed cigarettes.  Moore Rep. ¶ 12.  Moore considers three categories of substitutes to the cigarettes FedEx shipped:  fully-taxed cigarettes, smoking less frequently, and other sources of untaxed cigarettes.  Moore Rep. ¶ 12.  The third category Moore believes to be the most notable.  Moore Rep. ¶ 12.  Because many consumers

---

[5] Plaintiffs argue, like they did for Dr. Angell's testimony, that Dr. Williams's testimony is relevant to the assessment of civil penalties.  The Court's response is the same.  The jury does not levy the civil penalty, and so there is no need for the jury to hear Dr. Williams's testimony.

would have substituted to other untaxed or not fully-taxed cigarettes in lieu of FedEx-shipped cigarettes, "any increase in the State's and the City's tax revenues from closing the FedEx Ground distribution channel would have been negligible, because tax-paid sales would not have increased." Moore Rep. ¶ 13.

Dr. Moore buttresses his response to Plaintiffs' experts by conducting three econometric analyses purporting to show the substitution effect for untaxed cigarettes in action. Moore Rep. ¶ 61. First, Dr. Moore compared trends in tax-paid sales between New York, neighboring states, and tobacco-producing states with excise tax rate changes in each. Moore Rep. ¶ 63. This analysis, according to Dr. Moore, produced findings consistent with relative tax rates between New York State and other states driving the consumption of tax-paid cigarettes in New York. Moore Rep. ¶ 63. Second, Dr. Moore estimated models of the demand for tax-paid cigarettes. Moore Rep. ¶ 84. The results of this analysis are then used to show that substitution to untaxed cigarette outlets and taxed cigarettes in other jurisdictions could reduce New York cigarette tax revenue while not reducing overall smoking levels. Moore Rep. ¶ 109. Third, Dr. Moore uses data on driving distances to locations in bordering states or in-state reservations with lower or no cigarette tax to estimate how many of the New Yorkers to whom FedEx delivered cigarettes would have found it worthwhile to drive to another state or a reservation for lower-priced cigarettes. Moore Rep. ¶ 113. The results showed that for about 92.8% of consumers in New York State, it would have been worthwhile to drive to a bordering state or an in-state reservation to buy cigarettes if they bought at least two cartons. Moore Rep. ¶ 121. Because basic economic knowledge suggests that substitution effects exist for untaxed cigarettes, and his research confirms that finding, Dr. Moore argues that Plaintiffs' proffered expert witnesses dramatically

overestimate the tax revenue and public health effects of FedEx's conduct. Moore Rep. ¶¶ 126, 127.

Plaintiffs argue that the Court should exclude Dr. Moore from testifying on all the opinions in his report because all of Dr. Moore opinions concern what the consumers to whom FedEx delivered cigarettes would have substituted those cigarettes for. Because the correct formula for damages does not consider the but-for consumption habits of the consumers at issue, Plaintiffs argue, Dr. Moore's opinions are irrelevant. FedEx opposes because it disagrees with Plaintiffs' proposed formula for calculating damages. The dispute between Plaintiffs and FedEx over whether to admit Dr. Moore's testimony is thus essentially a rehashing of the same arguments the parties made in their summary judgment briefing on damages.

Dr. Moore's report is useful insofar as it speaks to the proper amount in damages, but the Court has now rejected the legal theory underlying Dr. Moore's calculations.[6] Therefore, Dr. Moore's testimony on the matters discussed in his report is excluded from trial.

> 2. <u>Scott Drenkard</u>

Scott Drenkard is an economist and Director of State Projects at the Tax Foundation, a nonpartisan tax research institute in Washington, D.C. Drenkard Rep. at 2. Drenkard received his B.S. in economics from the University of Mary Washington and his M.A. in economics from George Mason University. Drenkard Rep. at 2. He has coauthored multiple books and publications on tax policy. Drenkard Rep. at 2. He has also given legislative testimony in multiple states on tax policy. Drenkard Rep. at 2.

---

[6] Dr. Moore's report also challenges Dr. Angell and Dr. Williams's assessment of the public health effects of FedEx's conduct, but since the Court will not admit Dr. Angell and Dr. Williams's testimony as to those matters on grounds of relevance, Dr. Moore's testimony on those same matters would be irrelevant.

Drenkard provides an explanation for what smuggling, tax leakage, and arbitrage means, and why they occur as economic phenomena. Drenkard Rep. at 6–8. Drenkard then cites to statistics and studies showing the extent of smuggling in the United States and in particular states, including New York. Drenkard Rep. at 12–13. He attributes higher rates of cigarette smuggling in certain states to high excise taxes. Drenkard Rep. at 13. Drenkard surveys and explains the specific methods people use to evade cigarette taxes, including "smurfing," selling "loosies," and buying from American Indian reservations. Drenkard Rep. at 19–25. Finally, Drenkard shows that the revenue New York receives from cigarette taxes is highly unstable, even though taxes have consistently increased. Drenkard Rep. at 29–31.

Plaintiffs argue that the Court should exclude the testimony of Drenkard because his opinions are irrelevant given the damages formula for this case. This Court agrees. Drenkard's opinions all concern cigarette smuggling, which is not relevant to the facts of the case. Drenkard's opinions on the extent of cigarette smuggling in New York, and how it undercuts New York's efforts at raising tax revenue from cigarette taxes, are not relevant when each cigarette carton shipped by FedEx caused Plaintiffs to incur damages in the amount of avoided tax. They would be relevant if damages in this case were calculated as the amount of tax revenue Plaintiffs lost because consumers bought the cigarettes FedEx shipped instead of taxed cigarettes. Damages in this case will not be calculated in that way, so Drenkard's testimony is irrelevant and thus inadmissible.

3. Patrick Fleenor

Patrick Fleenor is the chief economist at Fiscal Economics, Inc., a consulting firm specializing in public policy analysis. Fleenor Rep. at 1. Fleenor received his B.A. in economics and political science from Albion College and two Master's degrees, one in political science

from American University and one in economics from George Mason University. Fleenor Rep. at 1. As a consultant, Fleenor is frequently asked to testify before state legislature on the likely effects of proposed changes to state tobacco policy. Fleenor Rep. at 1. He has over two decades of experience with tobacco-related policy issues and has written a comprehensive history of cigarette tax evasion in New York, published by the Cato Institute. Fleenor Rep. at 1. Fleenor used to be the chief economist at the Tax Foundation, a public policy institute, where he worked on similar issues related to cigarette tax evasion. Fleenor Rep. at 1.

FedEx retained Fleenor to testify on how cigarette tax evasion occurs in New York and to assess the effectiveness of enforcement efforts against it. Fleenor Rep. at 1. As part of that objective, Fleenor offers his opinion on whether the conduct alleged against FedEx would have caused Plaintiffs to suffer significant tax losses. Fleenor Rep. at 1. Fleenor surveys in detail the various ways people have attempted to evade cigarette taxes, including border shopping, Fleenor Rep. at 5, online sales, Fleenor Rep. at 7, and bootlegging, Fleenor Rep. at 10. Fleenor's report delves into the history of each method as well, arguing that many enforcement efforts against cigarette tax evasion have failed. Fleenor Rep. at 15–18. Lastly, Fleenor notes that, partly because there are so many ways to evade cigarette taxes, detecting whether cigarettes are legally possessed or not is difficult. Fleenor Rep. at 1–2, 19.

Fleenor's testimony is also largely inadmissible. Fleenor testifies to similar subject matter as Drenkard, namely, ways of evading cigarette taxes and the effects of such evasion on states' tax revenues. For the same reasons Drenkard's testimony on these matters is inadmissible, Fleenor's is as well.

Fleenor, however, also puts forth an opinion addressing whether FedEx knew that the cigarettes it was shipping were contraband cigarettes. Fleenor explains in his report that given

the regulatory scheme for taxing cigarettes, it can be difficult to discern contraband cigarettes from properly taxed cigarettes. Fleenor Rep. at 1–2. For example, cigarette cartons do not bear tax stamps, while individual packs do, so one usually cannot tell that a carton contains untaxed cigarettes from inspecting the carton. Fleenor Rep. at 2. Additionally, during the time period relevant to this case, Native Americans could purchase unstamped cigarettes from Indian businesses for personal use. Fleenor Rep. at 2. Such cigarettes would be untaxed cigarettes, but not contraband cigarettes.

Plaintiffs argue that Fleenor's opinion is inadmissible because Fleenor did not review the facts in the case and irrelevant because Plaintiffs' evidence that FedEx knew it was shipping untaxed cigarettes is not based on anybody's visual inspection of the cigarettes. The Court disagrees. Fleenor did not purport to have reviewed the evidence in the case; his opinion concerns the implications of New York's cigarette regulation scheme, about which he is certainly an expert, on the ease with which one can identify contraband cigarettes in general. And Fleenor provides reasons additional to visual observation for why detecting contraband cigarettes can be difficult.

Admittedly, Fleenor's methods for arriving at his opinion regarding the difficulty of identifying contraband cigarettes are not advanced. Fleenor simply applies his knowledge of the regulatory landscape for taxing cigarettes to the issue of how conspicuous cigarettes are. Nonetheless, his explanations make sense and are based on real facts about how cigarettes are regulated. Therefore, the Court will allow Fleenor to testify on identifying contraband cigarettes.

## IV.    CONCLUSION

For the reasons set forth above, FedEx's motion in limine to exclude the reports and testimony of Laura Stamm, Dr. Sonia Angell, and Dr. Rebecca Williams is GRANTED IN

PART and DENIED IN PART as to Stamm, GRANTED as to Dr. Angell, and GRANTED as to Dr. Williams. Plaintiffs' motion in limine to exclude the reports and testimony of the Dr. Michael Moore, Scott Drenkard, and Patrick Fleenor is GRANTED as to Dr. Michael Moore, GRANTED as to Drenkard, and GRANTED IN PART AND DENIED IN PART as to Fleenor. Additionally, the parties' requests for oral argument are DENIED. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 472, 477, 480, 519, and 521.

Dated: October 10, 2018
       New York, New York

                                        _____
                                        Edgardo Ramos, U.S.D.J.